**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**FILED**
JAMES J. WALDRON, CLERK

December 3, 2009

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: s/ Margaret Cohen, DEPUTY

Case No.:    09-21261 (MS)

TRIANGLE TRANSPORT, INC.,

Chapter 7

                          Debtor.

**OPINION**

**APPEARANCES:**

**DUANE MORRIS**
Joseph H. Lemkin, Esq.
Walter J. Greenhalgh, Esq.
744 Broad Street
Newark, NJ 07102
Counsel for Triangle SC, LLC

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
Louis A. Modugno, Esq.
Eric Perkins, Esq.
Jeffrey Bernstein, Esq.
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102
Counsel for Trustee, Eric R. Perkins

**SCARPONE & VARGO, LLC**
James A. Scarpone, Esq.
50 Park Place, Ste. 1003
Newark, NJ 07102
Counsel for Official Committee of Unsecured Creditors

**ETTELMAN & HOCHHEISER, PC**
Gary Ettelman, Esq.
100 Quentin Roosevelt Boulevard, Ste. 401
Garden City, NY 11530
Counsel for Wallach Family

**GIBBONS PC**
Frank J. Vecchione, Esq.
One Gateway Center
Newark, NJ 07102-5310
Counsel for Star Distribution, Inc., d/b/a New Deal Logistics

**UNITED STATES TRUSTEE**
Mitchell B. Hausman, Esq.
United States Department of Justice
One Newark Center, Ste. 2100
Newark, NJ 07102

**HONORABLE MORRIS STERN**

This matter[1] tests the applicability and application of the concept of "good faith

purchase" in a Chapter 7 sale of assets.  It reflects the efforts of the appointed trustee to perform

his duties to monetize assets of a business which has been severely handicapped by internal

---

[1]The court heard a Motion to Approve a § 363(b) Sale in this Chapter 7 case on
December 1, 2009; this Opinion supports the Order approving the sale entered on that date.
Given the press of time and events, a rough initial draft of this Opinion was placed on the record
of December 1, with an explicit reservation by the court allowing for a final written version
which follows hereinafter.  This is a matter within this court's jurisdiction to hear and decide
pursuant to 28 U.S.C. § 1334(a) and the Standing Order of Reference entered by the United
States District Court for the District of New Jersey on July 23, 1984, and 28 U.S.C. § 1334(b).
This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) and (O).

warfare among shareholders, and with a co-venturer.  Ultimately, this case underscores the need

to make commercial good sense out of turmoil.  This is so, even while litigation is unfolding

alleging serious and not unfounded transgressions during sale negotiations by the insider who

would be deemed the "good faith purchaser."

I.    **Introduction**.

Debtor, Triangle Transport, Inc., filed a Chapter 11 petition on May 1, 2009.  It operated

through its management (Mr. Parker and Ms. Blanc, in combination controlling shareholders and

principal operating officers) as a debtor-in-possession through October 16, 2009, at which time

this court ordered the conversion of the case to Chapter 7.  Two full days of hearings (October

14 and October 16, 2009) were the immediate lead-in to the conversion, though the prior

five-month period of the Chapter 11 case reflected steady contest and conflict between Parker

and Blanc, on the one hand, and both the debtor's minority shareholders (the Wallach family)

and a former long-time joint venturer of the debtor ("Star Distribution," a/k/a "New Deal

Logistics," here "NDL"), on the other hand.  Parker and Blanc were engaged in litigation with

the Wallachs, prepetition; the debtor and NDL had been adverse in a separate prepetition case

which resulted in a judgment for NDL in an amount in excess of $1.3 million.  NDL, through an

affiliate, had also been the landlord of the debtor which had occupied a sizeable Jersey City

warehouse facility at a monthly rent of approximately $130,000.  Debtor occupied the Jersey

City facility at least until the wrenching events of the week following the case conversion.

The debtor's business, transporting merchandise and providing allied logistical services

for large retailers, is competitive.  Being wracked with internal dissension and litigation, and

then hammered by the collapse of the economy in 2008 (into this year), heavy losses were

3

seemingly inevitable.  Those losses were amplified in the Chapter 11 case.  Indeed, the single

most significant causative factor in the court's decision to convert the case was the extraordinary

losses postpetition (with the debtor projecting continuing losses through 2009 and well into

2010).

In the case, and apparently for many months before, the debtor was unable to secure

third-party financing.  An affiliate, Triangle S.C., LLC ("SC"), provided both a prepetition

line-of-credit and postpetition financing.  The prepetition secured line was subject to a

preference contention (perfection having postdated by several months the initial loan),

apparently to be countered to one degree or another by potential defenses or offsets, none of

which have yet been litigated.  The postpetition loan was permitted, and was accorded secured

and superpriority status via interim orders of the court.  At outset it was disclosed that SC and

the debtor had basically the same ownership; the degree of connection, however, was not fully

exposed to the court until the conversion hearing.  At that hearing there was testimony about the

sharing of staff and allocation of expenses between the debtor and SC.  There was also a

presentation by the debtor about the more far-reaching aspects of the "Triangle Network,"

showing affiliations around the country with other enterprises through which the debtor worked

(some on a commission basis).  Part of the network was owned to one or another extent by

Parker family members.  Some had Parker and Blanc as shareholders or members.  *Inter alia*, the

debtor's inability to get financing from sources outside of its network, questions about SC's

purported ability to fund the debtor's operations, concerns about operational entanglements with

SC (and perhaps others in the network), along with a history of internal strife and litigation

centering on accusations and cross-accusations of self-dealing and competition for the business

of the debtor, rounded out the list of causative factors in the court's decision to convert the case

on October 16.

Among the specifics which came to light in the conversion hearing were: (i) a signed

lease with SC as the lessee for warehouse space in South Kearny, New Jersey for approximately

$30,000 per month (said to be available to the debtor to house its operations at a substantial

saving in comparison to the lease for the Jersey City warehouse); (ii) the debtor's proposal to

relocate the business at the most critical service time of the year; (iii) the loss, learned in

September 2009 by the debtor, of a substantial customer of the debtor ("Charming Shops"), due

to sever its relationship in early November 2009 (but then advancing the business termination

upon the conversion); (iv) the affiliation of NDL and a company of the Wallachs to service

Charming Shops under and through a contract between Charming Shops and a third-party

logistics services provider; (v) the area of commerce occupied by the debtor is, by all accounts,

most significantly dependent upon *personal relationships* to maintain customers; and (vi) over

250 jobs were, to one extent or another, at stake, as were customer interests at the busiest time of

year.

When the Chapter 7 trustee took charge on Monday, October 19, 2009, he apparently

began negotiating for the sale of the business on as much of a "going concern" basis as was

possible.  First, he negotiated with Parker and Blanc; then with NDL.  Whatever specific events

transpired between Monday, October 19 and Monday, October 26, the upshot was that by

October 26 SC had hired much, if not all, of the debtor's staff, had readied and moved into the

South Kearny warehouse, had downloaded customer data from the Jersey City computers and

uploaded it to new equipment in South Kearny (apparently leaving all other furniture, fixtures,

trailers, tractors and yard equipment behind in Jersey City), and was servicing the debtor's

customers. Those events became the subject of the trustee's Adversary Proceeding complaint

against Parker, Blanc, SC, and others, hearings of October 26 through October 28, and the

issuance by this court of an Order to Show Cause with Temporary Restraints (dated November 4,

2009, with a return date of November 9).

Also part of the hearings of October 26 through 28 was a motion in the main case by the

trustee (allowed on shortened notice) for various elements of relief,[2] including a request for

authorization for the trustee to enter into an Interim Operating Agreement with NDL, in

anticipation of a possible sale pursuant to an outline of terms for an asset purchase agreement

whereby NDL would, if satisfied with the prospects for the business going forward, purchase the

assets of the debtor for $2.1 million. This offer had a "bailout" payment of $250,000 if, after a

sixty-day period of operation, NDL chose not to go forward with the deal. It later came to light

that NDL and the Wallachs were joining in this proposal (and later proposals).

The NDL purchase terms proved to be too sketchy, and the concept of immediate interim

operation mooted when this court, on October 28, ruled that temporary relief would *not* include

an order that the business of the debtor be moved, along with all of the employees, back to Jersey

City.[3]

---

[2]The trustee sought an Order (1) approving *nunc pro tunc* the trustee's continuation of the
debtor's business operations under 11 U.S.C. § 721; (2) approving *nunc pro tunc* under 11
U.S.C. §§ 364 and 105 the $200,000 loan from SC to the trustee; (3) approving *nunc pro tunc* the
trustee's payment of certain preconversion expenses under 11 U.S.C. § 105 such as wages,
salaries and employee benefits; and (4) authorizing the trustee to enter into an Interim Operating
Agreement with NDL. (Docket entry 273, trustee's application filed Oct. 26, 2009.)

[3]In broad outline the temporary restraints of the November 4, 2009 Order to Show Cause:
(1) required the defendants to allow the trustee, his professionals, and persons whom he

By the November 9 return day of the Order to Show Cause (also the continued hearing date for the more general motion for relief associated with the NDL contingent proposal), the sands had once again shifted; Parker and Blanc had made a noncontingent proposal, besting the sale terms of NDL-Wallach by approximately $500,000.[4]  They had also proposed a settlement of the Adversary Proceeding and had linked a general release and settlement of that litigation to their asset purchase offer.  All of this was outlined in the November 9 hearing record.  At that time the trustee requested time to flesh out the Parker-Blanc proposals; matters were adjourned to November 18.

In fact, the outlined position of Parker-Blanc of November 9 was definitized before the adjourned hearing; on shortened notice, both a motion to approve bidding procedures (using a full form Asset Purchase Agreement and fleshed out Parker-Blanc terms as the "stalking horse" bid) and a motion to approve settlement of the Adversary Proceeding, were scheduled for November 18.

---

authorized access to the Kearny premises (unless the authorized individual were a competitor) and to the books and records of SC; (2) required the defendants within forty-eight hours to produce to the trustee a complete inventory of SC, including intangibles; (3) restrained the defendants from representing that they were affiliated with, successors to or agents of the debtor and to advise debtor's clients that defendants were servicing debtor's client accounts on a temporary basis only; (4) required the defendants to keep safe and to insure any debtor property which the defendants had taken over; (5) required SC to indemnify and to hold the trustee and the estate harmless against liabilities from the SC's operation of debtor's business; (6) restrained the defendants from exercising any claim or lien against the debtor and its subsidiaries including one arising from postpetition financing; (7) required defendants to bill debtor's customers through October 25, 2009 and to turn receipts over to the trustee.  (Adv. Pro. docket entry 6.)

[4]In financial terms, Parker-Blanc offered $2.1 million ($1.1 million at closing and $1.0 million a year later), plus a $300,000 carve out from accounts receivable in exchange for the balance of accounts and other intangibles (leaving the trustee with *all* hard assets except computers); *compare* NDL's offer at $2.1 million basically for "everything."

At the hearing of November 18, both the sale bid procedure and the settlement were examined and positions pro and con were advocated.  The hearing was continued to November 20.

At the outset of the November 20 hearing Parker-Blanc volunteered the complete de-linking of the sale and the Adversary Proceeding settlement/release.  An amended Asset Purchase Agreement reflecting this change was submitted.  The court ruled on the proposed Adversary Proceeding settlement, denying the motion to approve it, without prejudice; the trustee was instructed to continue his investigation into the conduct of the defendants.

The court then approved bid procedures using the Parker-Blanc proposal as the standard against which bids would have to be made.  An auction date (for "higher or better" bids) was set for December 1, with other bid proposals (and evidence of qualification) due by November 30.

Adding to matters on November 20, NDL-Wallach attempted to put forth at the hearing the barest outline of a counterbid to that of Parker-Blanc in an obvious attempt to head off the impending sale and sale hearing.  The financial terms included at-closing funds which might have approximated that of Parker-Blanc, but the "back-end" $1 million bid by Parker-Blanc (due in no more than a year, firmly secured by a cash escrow, and noncontingent) was again countered by NDL-Wallach by a contingent offer ("25% of all sales one year from closing that are in excess of $6,000,000 from the former TT customers").  Also proposed were aggressive "conditions" of closing, including having this court issue preliminary and permanent injunctions against Parker, Blanc, and, apparently, SC (seeming to request a bar to Parker's and Blanc's benefiting from their customer relations), *and* a bar to their bidding based upon a demanded finding of their "bad faith."

8

This court rejected the nonfinancial "conditions" to closing, determining: (i) that a hearing on 11 U.S.C. § 363(m),[5] including its "good faith" element, would be conducted at the sale hearing after the higher or better bid was determined; and (ii) that no restraint would issue *as a component of the sale*[6] (rather, whatever restrictive covenants existed in the debtor's Shareholders' Agreement would be "quitclaimed" to the winning bidder for whatever worth they might have). The court was reluctant to link the sale to the Adversary Proceeding, other than to assess, if necessary and at the sale hearing scheduled for December 1 after the auction, how the allegations in the Adversary Proceeding might impact on a determination related to § 363(m). The court, however, did allow NDL-Wallach to be prequalified financially as a bidder (based upon counsel's representation that bidding would only occur if his trust account held cash to back the bid). The trustee could consider at the time of the auction and within his sole discretion, the financial aspects of their bid as a backup bid if NDL-Wallach chose to formalize it for that narrow purpose. At a hearing settling the form of the bid procedure order (November

---

[5]§ 363

(m)   The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

[6]An Order was issued on November 23 (emanating from the October 28 Order to Show Cause in the Adversary Proceeding) which included preliminary relief. Such relief was to assure, among other things, that the sale process would go forward unimpeded by unfair competition by SC while it serviced the debtor's former customers up to the sale (and perhaps closing). However, a hearing to lift those restraints and determine their applicability after the sale (depending on the sale results) was anticipated in the Order. Such a hearing was either to take place on December 1 or be scheduled at that time.

9

23), many of these points were reiterated.  That order plainly "advised and admonished" NDL-Wallach that they would have to compete with the Parker-Blanc bid unless they chose to rely on this court disqualifying Parker-Blanc as a "bad faith" purchaser or otherwise.

The stage was thus set for the possible submission of bids, auction and the hearing to approve the results of the § 363(b) [7] sale process.  On November 30, with a noon deadline for bid submissions, NDL-Wallach e-mailed to the court (copies to counsel of record) a nonconforming but higher bid than the Parker-Blanc bid.[8]  The most significant nonconforming aspect of the NDL bid was the reintroduction of the restraint requirement, couched in terms of a request of the court to reconsider its decision and Order of November 23 in this regard.

II.    ***In Re Abbotts Dairies*** **- Applicability**.

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), remains the foundation of § 363(m) law in this Circuit.  *Abbotts Dairies* on its face requires this court (and in some circumstances the district court) "to make a finding with respect to the 'good faith' of the purchaser" in § 363(b)(1) sales.  788 F.2d at 150.  The purpose of this requirement is to aid and thus enable the Court of Appeals in the "proper exercise of [its] supervisory authority over both the district court and bankruptcy courts."  *Ibid*.  Its rationale as stated is threefold: first, this court

---

[7]§ 363
        (b)(1)   The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . .

[8]NDL-Wallach offered $2 million at closing, leaving the trustee all cash receipts from accounts receivable collected to date and the balance of the accounts receivable.  The offer was not fully detailed (making no reference to a form of any Asset Purchase Agreement, nor indicating whether hard assets were or were not to be purchased).

10

is "best able" to make the determination because of its familiarity with the parties and

proceedings; second, the requirement promotes "finality of the bankruptcy court's judgments

under section 363(b)(1)," giving notice to any prospective appellant to seek out a stay pending

appeal or risk dismissal for statutory mootness on appeal per § 363(m); and, third, in Chapter 11

cases this requirement "squares" § 363(b)(1) sales with the "good faith" requirement of

§ 1129(a)(3).[9]  *Ibid.*

How *Abbotts Dairies* is to be applied in Chapter 7 cases – and why – is worth some

inspection.  Surely the concern that Chapter 11 creditor protections will be lost in the § 363(b)(1)

sale process is not applicable in Chapter 7 cases.  What is left of the rationale in Chapter 7 cases

is (i) that bankruptcy courts are best situated to make the determination under § 363(b), so they

should make it, and (ii) prospective appellants should be on notice to seek a stay pending appeal

when such a finding is made.

Of course, neither of the applicable reasons for this court being required to make a

finding as to whether the § 363(b) sale purchaser is a good faith purchaser *dictates that there be*

*a finding of good faith in order to authorize a sale*.  Section 363(m) on its face addresses solely

"reversal or modification on appeal" of a sale authorization.  *Abbotts*  implies that a sale

involving "impermissible collusion . . . that would negate [the purchaser's] status as a purchaser

---

[9]§ 1129

      (a)    The court shall confirm a plan only if all of the following
            requirements are met:
            . . .
            (3) The plan has been proposed in good faith and not by any
            means forbidden by law.

11

'in good faith'" is not in and of itself necessarily invalidated.  788 F.2d at 151.  In the absence of

a good faith finding, *Abbotts Dairies* directs that a  "value" determination must be made.  "If the

court determines that [the purchaser] did not pay 'value,' it will then have to determine whether

it has the power to undo the sale. . . ."  *Ibid*.  What is not discussed in *Abbotts* is an eventuality

with a positive determination of value but a negative one on good faith.  Might  a "bad faith (or

non-good faith) purchaser for value" still qualify to be a winning § 363(b) sale bidder (though by

definition not garnering the benefits of transaction finality via statutory mootness upon

appeal)?[10]

There is also a functional point that deserves consideration: Chapter 7 trustees have a

"chief purpose" long codified in § 704(a)(1) to "collect and reduce to money the property of the

estate . . . and close such estate as expeditiously as is compatible with the best interests of parties

in interest. . . ."  *See generally Katchen v. Landy*, 382 U.S. 323, 328 (1966).  In most cases a

Notice of Private Sale is initiated by the Chapter 7 trustee as a "negative notice"; if no objection

is timely filed, then the sale is approved without a hearing and without any finding expressed by

the bankruptcy judge.  However, when there is an objection and a contest surrounding a sale

even by a Chapter 7 trustee, appellate review remains possible.  Of course, it is the appeal which

spawns the statutory mootness inquiry and the reflection on § 363(m).  It is thus incumbent upon

this court to make a *current* finding advising, in advance, the appellate court if there should be

an appeal, of the bankruptcy court's close-in view of the *relevant* parties and proceeding in

§ 363(m) terms.  Though related to approving a § 363(b) sale and to be made at the time of

---

[10]A presumably unacceptable reading would be that a bidder who engages in, e.g.,
"impermissible collusion" in the sale process, nonetheless qualifies as a "good faith purchaser" if
it is determined that the colluding bidder has given "value."

decision to approve and authorize the sale,[11] the § 363(m) decision might not in every case and *inevitably* be consonant with sale approval and authorization.  Much of the degree of connection between § 363(b) and § 363(m) could be a function of how one defines "good faith purchaser," a definitional puzzle in certain settings, including some of the more competitive commercial situations.

There, of course, is no Bankruptcy Code definition of "good faith" as embodied in § 363(m).  *Abbotts Dairies* (788 F.2d at 147), placing heavy reliance on *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195 (7th Cir. 1978), (i) has linked good faith to value (572 F.2d at 1197), and (ii) has placed emphasis on "conduct in the course of the sale proceedings" (*id*. at 1198), as follows:

> Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*See generally* 3 COLLIER ON BANKRUPTCY, ¶ 363.11 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)

A comparison of the good faith-negating factors cited in *Abbotts Dairies* with the allegations *sub judice*, is helpful.  The *Abbotts Dairies* factual context included the following:

> (i)    Motions filed *on the same day as the filing date of the Chapter 11 petition* seeking approval of two agreements: an "Interim Agreement Concerning Sale of Inventory and Lease of Certain Assets"; and, an "Asset Purchase and Lease Agreement" (788 F.2d at 144);

---

[11]*But see In re Thomas*, 287 B.R. 782 (B.A.P. 9th Cir. 2002) (reasoning that facts showing lack of good faith are more likely to emerge *after* the sale, thus requiring remand for findings under a Rule 60(b) motion).

(ii)     On the case's first day the Interim Agreement was approved based upon testimony of the debtor's CEO that existing financing was ebbing, replacement financing could not be found, and only one day of inventory remained (*id.* at 145);

(iii)    The CEO testified that the Abbotts trademarks and milk delivery customer list would lose substantially all of their value (said to be $3 to $4 million) if operations ceased (*ibid.*);

(iv)    Cross-examination at the first-day hearing exposed the informal agreement between ADC, the stated suitor, and the CEO that he would be retained by ADC as a consultant (at his then current salary of $150,000 per year) "provided the bankruptcy court approved the Interim Agreement," and, further, that the CEO had been offered a senior executive position with ADC for five years (at his then current salary) premised on ADC's purchase of the debtor's assets and, further yet, there was the hope that the CEO would be relieved of certain personal liability on Abbott's obligations (*ibid.*);

(v)     Among the terms of the approved Interim Agreement was that ADC "expressly retained . . . right to compete with Abbotts for customers and to continue to serve Abbotts' customers under a different label if the Purchase Agreement was not ultimately approved" (*id.* at 145 n.1);

(vi)    The "expressly retained" right in ADC became a point of contention with other bidders (Cumberland submitting two alternative bids for the purchase of both trademarks and the Abbotts' customer list, one based upon court rescission of the retained right, and a higher bid coupling the rescission with a requested ninety-day restraint against ADC competing with Cumberland for any of Abbotts' customers) (*id*. at 146); and

(vii)   Cumberland's requested relief was completely denied and it, along with another bidder seeking only the Abbott trademarks, withdrew their bids (all three of which provided higher guaranteed minimum payments than the ADC bid) (*ibid*).

In rejecting the assertion of ADC and the debtor that immediate emergent action was

necessary to preserve value in trademarks and other assets (thus, as the argument went,

14

demonstrating an *implicit* finding of good faith by the bankruptcy court), the Third Circuit (788

F.2d at 148) opined:

> The factual findings upon which ADC and Abbotts base this assertion
> go only to the need to act immediately so as to avoid any diminution
> in the value of Abbotts' trademarks and other assets. [The appellants']
> assertion of collusion, on the other hand, concerns, *inter alia,* the
> claim that the "emergency" justifying the immediate sale of Abbotts
> was itself contrived or orchestrated by ADC and Abbotts. For
> example, they claim that-in exchange for a lucrative employment
> agreement for Mr. Gwinn, Abbotts' Chairman and Chief Executive
> Officer-Abbotts permitted ADC to manipulate the timing of Abbotts'
> bankruptcy so that the bankruptcy court had no choice but to approve
> the Interim Agreement on August 10, the terms of which were
> designed to preclude any truly competitive bidding for the assets on
> September 12.  Surely, if [appellants] substantiated these claims, it
> would, as a matter of law, constitute "collusion between the
> purchaser and ... trustee [or in this case, the debtor-in-possession], or
> an attempt to take grossly unfair advantage of other bidders,"
> sufficient to destroy ADC's "good faith status."  *In re Rock Indus.
> Mach.Corp,,* 572 F.2d at 1198.

In the case at bar, there is a substantially different factual context than that of *Abbotts*

*Dairies*.  That context, in summary form, is as follows:

> (i)    After a failed Chapter 11 case (in which NDL-Wallach were
>        fully engaged, active, and skirmishing with the Parker-Blanc
>        led debtor on a constant basis), the Chapter 7 trustee was
>        introduced into the case (appointed by order of October 19,
>        2009);
>
> (ii)   No pre-existing deal or first day deal was cut between the
>        trustee and the two warring factions of insiders (NDL being
>        viewed as an insider based upon its previous long-term
>        position as a joint venturer with the debtor, its tie-in through
>        an affiliate as landlord in Jersey City, and its evident relation
>        with minority shareholders of the debtor, the Wallachs);
>
> (iii)  NDL-Wallach had already succeeded to a very substantial
>        customer of the debtor, Charming Shops, by affiliating with
>        a third-party bidder for the business, the debtor having been
>        terminated by notice in September, initially to be effective in

15

November 2009 (the effective date apparently having been advanced into October following the conversion) (*see* transcript of October 16, 2009, main case docket entry 260, at pp. 9-49, the Rosa testimony, for insight into the nature of the competition in the logistics business and the particular jockeying for customers between the two key insider factions);

(iv)    The trustee negotiated with *both* factions in the October 19 through October 24 period, thus appropriately taking advantage of the intense competition and the all-too-obvious "bad blood" between them;

(v)    The trustee reached a tentative deal with NDL, evidenced by a letter of intent (subject to court approval which never developed) which embodied terms of an interim operating agreement and an outline of an asset purchase agreement which was *contingent* upon developments in the sixty-day "look-see" period ($2.1 million was to be the purchase price, with a $250,000 payment if NDL chose not to exercise its purchase option);

(vi)    Then, by Monday, October 26, the scenario-scrambling events unfolded, with SC, Parker and Blanc engineering the initiation of business under the banner of SC in SC's quickly readied South Kearny warehouse, hiring essentially all of the debtor's employees, servicing its customers through the South Kearny facility, and utilizing the database through which the debtor had operated (via downloading of the data in Jersey City and uploading same in South Kearny);

(vii)    The inflammatory actions of SC, Parker and Blanc prompted hearings (October 26 through October 28) and sufficient findings on a tentative basis to generate an Order to Show Cause with Temporary Restraints, but not an immediate order to retransfer "the business" to Jersey City;[12]

---

[12]This court set forth on the record (more than once) its concern that a retransfer of operations as the logistics business season was reaching its seasonal climax might put the entire business in jeopardy, would impact on the workforce (said to be up to 250 people) by, again, unsettling them, and was not essential to expeditious sales efforts by the trustee (given the availability of other temporary relief as ordered).

16

    (viii)    Thereafter, the trustee and Parker-Blanc revitalized their negotiations and the stalking horse bid and bid procedure was developed; and

    (ix)    At the November 30 bid submission deadline, NDL-Wallach proffered a yet higher but nonconforming bid, seeking a restraint against Parker-Blanc's post-sale competition (contrary to the Bid Procedure Order).

The *factual* underpinning of the polestar Third Circuit case certainly does not synchronize with the matter at bar.  Here, at the liquidation stage in a Chapter 7 case, the appointed trustee has been dealing with two factions of enemy insiders in an effort to meet his § 704(a)(1) duty. *Abbotts Dairies* is different.  Nevertheless, are the precipitous acts of Parker-Blanc, the subject of the ongoing Adversary Proceeding, such as to *disqualify* them as bidders or otherwise *justify or require restraints as part of the sale process*?  NDL-Wallach argue for both complete disqualification and permanent injunction against competition.[13]

III.    **The Impact of the Precipitous Acts of SC, Parker and Blanc on Bidding**.

Even at what is now the earliest stages of the Adversary Proceeding initiated by the trustee against SC, Parker and Blanc, it is not a quantum leap to conclude *ad interim* that they, as a minimum, engaged in acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Thus, the automatic stay would seem to have been violated.  Other causes of action articulated by the trustee are certainly not baseless.  The end result of this litigation, however, remains for the future.  This court is fully satisfied that processes and ultimate remedies available through the

---

[13]The Office of the U.S. Trustee and the "old" Creditors Committee join with NDL-Wallach, at least as to the disqualification of Parker-Blanc; the Chapter 7 trustee argues, along with Parker-Blanc, to the contrary.

Adversary Proceeding make that litigation the vehicle with which to deal with any *proven* offenses (including offenses to this court).

This court's more immediate focus is narrowed to the "playing field" occupied by the two insider factions (there being no third party bidders[14]).

The position of NDL-Wallach (and to one or another extent other objectors) appears to be that the acts of Parker-Blanc (i) gave them an unfair advantage in bidding, and (ii) were so outrageous as to be a fraud on the court and all of those operating under its auspices in the case. From this court's perspective, in this particular case, the "fraud on the court" issue is well attended to in the Adversary Proceeding. The "unfair advantage" issue must be plumbed.

For analysis purposes, this court can theorize about the "replanting," hypothetically, of the debtor's business back both in time and locale, to Jersey City on Friday, October 23. Such a starting point for analysis would theoretically neuter the unfairness argument by negating the business move. From that point, a number of business programs could have played out. One such program offering would have been (as it actually was), the NDL "look-see" contingent deal. This deal had the distinct (and, in this court's view fatal) disadvantage of dependency on the NDL-Wallach ability to "steal the flag" from Parker-Blanc in the customer relation wars of the logistics business. Parker-Blanc would have either countered with a noncontingent deal (as they, in fact, did), or, in the *extremely* unlikely event this court approved a long lead time contingent

---

[14]Though the trustee stated on the record that he reached out for non-insider bidders, the prospects of other bidders coming forth were always slim; the $2.1 million stalking horse bid for limited assets (some accounts receivable, essentially no "hard assets," and succession rights to the debtor's business, however, one would describe that) is driven by factional rivalry. The insiders would bid far in excess of what would be offered by any third party who would be divorced from the trench warfare that has characterized the business lives of Parker, Blanc, the Wallachs and NDL since well before the May 1, 2009 petition date.

deal with NDL, they could have eschewed bidding in favor of head-to-head competition for the

customers (risking the development of customer satisfaction with the interim operator – or

customer inertia – and loss in the relationship contests).  The great advantage available to

Parker-Blanc was that they needed no option period in which to develop customer relations.  The

customers appear to have been theirs.  If that were not the case, or NDC-Wallach had any

confidence that they would win in the competition for customers, NDL-Wallach's option deal

(and later their contingent proposal followed by their court-restraint proposal) would have been

overcautious indeed.  In fact, NDL and the minority shareholding Wallachs were able (and have

all along been able) to assess their immediate customer reach and their need for a period to

develop customer engagements if not marriages.  That assessment appears to have led them to

require, as a condition of their bidding, the imposition of a court-ordered restraint to eliminate

business competition.

Staying with the hypothetical recasting of events, if this court denied the NDL option

program and sent the trustee back to the bargaining tables (a most likely event), Parker-Blanc

would have remained better situated because of what appears to be their greater prominence with

the customers.  NDL-Wallach would have had to have been satisfied to bid for the business on a

noncontingent basis (competing in the marketplace as with the Charming Shops account).

In such scenarios and however one speculates about events which *could have* transpired

without the Parker-Blanc move, it is *not* a matter of speculation that no deal-enhancing

injunction could have issued to take Parker and Blanc out of competition with NDL-Wallach.

There was and would be no lawful springboard into the equitable cosmos (so hoped for by

NDL-Wallach), unless existing Shareholders' Agreement covenants against competition were to

be relied upon.  Yet it is clear that NDL-Wallach would not be satisfied with their lot as mere

"quitclaim" purchasers of these contract provisions.  This has been made evident on the record

before this court.

Moving from a recast hypothetical to the actual status of the bid playing field on and after

October 26, the mere change in location (from Jersey City to the South Kearny warehouse),

though perhaps fitting into SC and Parker-Blanc plans for the future, was an expense to them and

not in and of itself a "game changer."  *Control* of the business under the name of SC was

promptly dealt with by the temporary relief which required notice by SC to the debtor's

customers that such service was being done on only a temporary basis; moreover, SC was

restrained from holding itself out as a successor to the debtor.   (*See* Adv. Pro. docket entry 6.)

So the issue remains: can NDL-Wallach isolate and define a factor which has so grossly

unbalanced the bid process in Parker-Blanc's favor as to justify their disqualification and/or the

issuance of a restraining order against their post-sale competition?  Unlike *Abbotts Dairies*, there

is no allegation *sub judice* that customer lists are secret or proprietary, nor are there any

trademarks at issue.  Moreover, in terms of all business know-how and customer insight,

NDL-Wallach is made up of the ultimate in operational and technological expert insiders.  *See*

Guy Wallach Cert. ¶ 11 (Adv. Pro. docket entry 7).  Nevertheless, much of the objectors'

attention centers on the downloaded data from the debtor's computers.

Substantively, there is a serious question about whose data was downloaded.  The court

heard testimony from Mr. Gordon (called by the trustee as a witness in the hearing of October

28), the debtor's Director of Information Technology who moved along to SC.  He testified at

length.  *See* Main Case docket entry 295 (Tr. 4-82, Oct. 28, 2009).  The salient points of the

20

testimony describing the nature of the data Gordon downloaded from the debtor's computers and

uploaded to SC's system on or about October 24 (with transcript page references) are as follows:

(i)  Customer names, their distribution center addresses, their billing addresses

and tariffs/rates, were taken (Tr. 50-52);

(ii)  All of the data was uploaded into an SC database *and* the Softpoint system

(a commercially available program apparently designed for or otherwise

compatible with the logistics business) (Tr. 50:25);

(iii)  SC had purchased a license or an increase in scope of a license for the

Softpoint software on October 23 (Tr. 23:14-25:24);

(iv)  An "EDI mapping system," specific to customers was taken and uploaded,

a system available to others ("Performance Team" and "NDL") and available

"for purchase" (Tr. 52-53);

(v)  Using Levi's as a customer for purposes of illustration, and in response to

a question about Levi's hypothetically leaving SC and its ability to go

"down the street" to another operator, the following exchange is of record

(Tr. 58:1-59:1):

A     Would it be able to hire another operator down the street?
Q     To ensure deliveries.
A     It's all according to who the operator was.
Q     Okay. Well, what would Levi's require? This EDI mapping
       seems like it's a significant piece –
A     Right.
Q     – right, of the business?
A     Yes.
Q     Because that's kind of a real time communication?
A     Right. If that operator was using Soft Point, they would have
       that, because Levi is the one who paid for that process.
       Okay? And that was paid for through a company called

21

Performance Team out on the West Coast. Okay? So, that Levi owns that process, and therefore if the company set up a Soft Point system, then that could be loaded onto that Soft Point system, since that is the property of Levi.

Q    So –

A    Just as it is for the West Coast, and Miami, and a few other locations.

Q    So, if ABC entity and Elizabeth (indiscernible) system –

A    Yes.

Q    – Levi's could fire TSC and go over there, and starting tomorrow they will be able to logistically transport –

A    As long – yup, because as long as Soft Point would load up those EDIs for them and they would structure them, they could have them up and running.

(vi)    As to *payment for* and *exclusivity* of EDI mapping, as well as NDL's

*access to* Softpoint and EDI the following exchange is of record (Tr.

68:1-24):

Q    Who pays for the EDI?

A    The majority of the EDI work that, as far as mapping and coordinating into the Soft Point system was paid for by the retailers themselves.

Q    By the retailers, do you mean, let's –

A    Levi paid for theirs, American Eagle paid for theirs, Charming Shop paid for theirs, okay. So, basically, that was paid for by the retailer and not by Triangle Transport.

Q    So is this information something that's exclusive only to, let's say, last week, TTI?

A    No, no. Performance Team on the west coast, which is an independent entity, also utilizes the same software, also utilizes the same EDI.

Q    Any other entities?

A    Well, Performance Team, I think, has a facility in Miami, they have – there's a number of different entities throughout the country. Anybody utilizing the Soft Point software can utilize those EDIs.

Q    Do you if now (*sic*: know) right now as we speak, NDL has access to Soft Point and that information?

A    The last time I knew NDL had the system because when the split occurred, the breakdown of TWW and the split between

22

TT and NDL, NDL had a Soft Point system that had the exact same duplicate data that was on the TT system.

(vii)    SC owned two servers located in Jersey City which it had previously used, one being left behind in the move (Tr. 69:16-70:13);

(viii)    SC and others had access to the debtor's servers, including remote access, SC's being essential to its Mississippi operations (Tr. 71:14-72:13 and 81:5-15); and

(ix)    The witness's lay view of the "trade secret" aspects of the downloaded data is as follows (Tr. 72:24-73:5):

> THE WITNESS:    A trade secret is basically a process or an operation that is unique and give you either a technical or operational advantage.
> Q    Would you consider, I guess, any of the information on the Soft Point system to be a trade secret then?
> A    No, because it's public and it's more than one place. If it was only located in one location.

Mr. Gordon also provided a time line for the NDL-debtor joint venture (believed to have started in January 2001, Tr. 6:5-15, and ending at or in 2008, Tr. 5:22-25). His immediate supervisor was Guy Wallach (from November 1, 2002 until October 24, 2009). (Tr. 8:7-20).

The Gordon testimony is endorsed as being "truthful and accurate" by Guy Wallach ("Chief Information Officer" of the debtor "for many years . . . and intimately involved in operations"). *See* Cert., Adv. Pro. docket entry 7 at ¶¶ 1 and 11. The Guy Wallach Certification, obviously offered to encourage this court to order the return of business to Jersey City, made reference to the difficulties "a third party transportation company" might have in servicing customers. But Mr. Gordon, a veteran with Softpoint and experienced with the more sophisticated accounts would only need the customer account data (i.e., addresses, tariffs/rates,

23

EDI mapping) – data certainly available from the not overwhelming number of account customers if it were not downloaded – to be up and running quickly. *See* Guy Wallach Cert. ¶¶ 2-4. Finally, Guy Wallach makes the case that NDL-Wallach were and are positioned to compete, operationally and technologically, with SC, Parker and Blanc. Moreover, the Gordon downloading of data, though perhaps a transitory benefit to SC, did not give that adverse faction a gross advantage in bidding. Nor was the data – in and of itself and independent of the experience with the commercial program, Softpoint, and other experiential nuances – unavailable from other sources.[15] Guy Wallach drives the point home (citing the experience of himself, Joe Killeen of NDL and his family member, Brian Wallach) as follows (*id.* at ¶ 11):

> I have been the Chief Information Officer for TT for many years and have been intimately involved in operations. No one at TT is more knowledgeable of the Softpoint system or, I believe of TT's customer operations. If the operations are transitioned back to Harbor Drive I will continue to oversee those operations. I will not, however, participate in the operations presently being run by TSC. Moreover, it is my understanding that if the operations are transitioned back to Harbor Drive both Joe Killeen and Brian Wallach will oversee TT's operations. Joe Killeen and Brian Wallach were for many years in charge of the operations of the successful joint venture between TT and New Deal. As a result, both Joe Killeen and Brian Wallach are very familiar with the vast majority of TT's customers and their operations.

If Parker-Blanc were to have *lost* the bid, without a continuing restraint on their solicitation of former customers of the debtor, the current availability of the data to them would have become simply a matter of convenience, but not a necessity. If customers chose Parker-Blanc as their logistics provider, the data would have been readily available from the

---

[15]Nonetheless, *ad interim*, the use of the data was controlled and further transfer of it enjoined.

customer sources.  It is thus worth reiterating that at least as between the two insider factions

before this court, "the business" is one of relationships, not one operating through secret

processes or hard to gather information.  The benefit taken by downloading the data and bringing

it to SC on October 24 was transitory at best.[16]

IV.   **Restraints and Covenants Not to Compete**.

Under ordinary circumstances, a Chapter 7 sale of assets could *not* appropriately carry

with it a gratuitously issued judicial restraint, barring prior shareholders, officers, and employees

of the debtor being liquidated from competing with the purchaser.  While special circumstances

could dictate the need for a restraint if, e.g., cause were shown that proprietary information or

trade secrets or trademarks as sold were going to be wrongly used by such others, in competition

with the purchaser, *such circumstances are not involved in the case at bar*.

Nor does the Adversary Proceeding (and events underlying it) justify a sale-affecting

injunction.  As set forth throughout this Opinion, no conduct of Parker and Blanc requires a

remedy which would deny them their stock-in-trade, i.e., their customer relations.  The move to

South Kearny and the downloading of customer data, though significant as a basis for *substantial*

*relief* if proven, does not necessarily require restraint as a final remedy.  This is particularly the

---

[16]This court full well recognizes that its tentative findings of October 28, serving as a
basis for temporary (and later preliminary) relief in the Adversary Proceeding identifies the data
as part of the property of the estate obtained by the defendants in violation of the automatic stay
(§ 362(a)(3)), and that there could ultimately be a determination that Parker and Blanc acted in
bad faith (as well as tortiously and otherwise contrary to the Bankruptcy Code, in this regard);
moreover, this court cited the Shareholders' Agreement at Article VII which characterized
certain data processes and know-how as "unique" and/or "proprietary," and this court viewed the
moving of an entire business as the taking of a unique or special asset in applying the legal
standard for granting temporary relief; however, these points are for the Adversary Proceeding
and are by no means conclusive when admeasuring the relative positions of Parker-Blanc, on the
one hand, and the operationally savvy insiders, NDL-Wallach, on the other hand.

25

case since Parker and Blanc had made a qualified stalking horse bid and have now become the

successful bidder.   They have shown the money, putting "skin in the game."[17] They should

neither be taken out of play by disqualification of their bid, nor be restrained.  NDL-Wallach

seek to use the Adversary Proceeding either to disqualify their principal competitor, or to take an

advantage in the marketplace where both sets of fierce rivals would – and should – have to

compete for customer business.

Wallach's counsel, joining on his client's behalf in the NDL request for injunctive relief

in the sale process, has submitted a brief (November 30) expressing the view that the covenants

against competition in the Shareholders' Agreement (an exhibit to the hearing of October 26

through 28), to be "quitclaimed" to the winning bidder at the sale are both nontransferable and

unenforceable.  This court makes no finding on these issues as raised.  The Asset Purchase

Agreement simply includes whatever can be lawfully transferred in terms of the covenants.

There is no representation or finding of their validity, enforceability or transferability.  However,

if they *are valid and enforceable*, no prior court-ordered restraints would seem to be necessary to

buttress a purchaser's position in the marketplace.  If the covenants and related provisions *are*

*not valid and enforceable*, there is no reason or justification to replace them with

court-engineered relief.

_____

[17]Parker and Blanc have apparently taken to heart the advice offered by Creditors'
Committee counsel in his closing argument on October 16 when he admonished them to come up
with money if they wanted to save their business and the 250 jobs it offered; they immediately
provided the cashless trustee with $200,000 to help make payroll and other expenses.  They also
have retained the employees through the move to South Kearny.  Whatever their motivation,
these acts and Parker-Blanc's bid *significantly* in excess of the financial terms of the
NDL-Wallach initial proposal (even if it were to be concluded via option exercise), are
undeniable parts of the record of this case.  Parker and Blanc do reflect a willingness at this time
to expose themselves financially and "buy back" their otherwise failed business.

26

V.      **Finding Required by *Abbotts Dairies***.

Based on this court's review of the record, consideration of the argument of counsel to the various parties-in-interest, and its *considerably greater than usual familiarity with the facts of this particular bankruptcy case*,[18] this court finds as follows:

(i)      There is no "collusion" nor even any hint of it, which would taint the sale process;

(ii)      A duly appointed and qualified Chapter 7 trustee has negotiated with the logical purchasers for the debtor's assets on as close to a "going concern" basis as could be mustered (given the extraordinary losses suffered by the debtor in this case and its projections of continued losses);

(iii)      These logical purchasers were and are two insider factions, each intensely antagonistic to the other, each with clear insight into customer lists, business data sources, operational and technological know-how, and the logistics business generally;

(iv)      Each faction stands ready to compete for business (the NDL-Wallach Group having within the past few weeks begun to service a very large customer – Charming Shops – which had been serviced by the debtor up to a date in late October);

---

[18]It is relatively rare that a case would compress into a six-month period the number of matters in contest evidenced by this case docket; the evidentiary hearings alone (October 14 and 16 as to conversion, and October 27 and 28, as to the Order to Show Cause with Temporary Relief) have given this court more than a mere glimpse into the workings of the logistics business and some of the character of the immediate parties.

(v)    While negotiating, Parker-Blanc sent the bankruptcy case into a certain degree of turmoil by moving the business location and undertaking to service the debtor's customers under the banner of affiliate SC;

(vi)    As a result of the immediately ensuing emergent hearing and given the prospects of the Adversary Proceeding, sufficient relief was developed to permit the negotiation and sale process to go forward (and, indeed, there is every reason to believe that, ironic as it may be, the precipitous actions of Parker and Blanc have "upped the stakes" and generated higher offers from the enemy factions);

(vii)    Parker-Blanc had made a credible bid which has become the stalking horse bid in a fully vetted and noticed sale process;

(viii)    Parker-Blanc's conduct does not involve fraud *in the sale process* (this court viewing the sale process as having only become crystallized with the exercise of the trustee's ultimate business judgment in negotiating and the putting forth the stalking horse bid as the cornerstone of his Bid Procedure Motion);

(ix)    Parker-Blanc's conduct has *not* been such as could reasonably be found to have taken grossly unfair advantage of other bidders (there being little likelihood of competitive outsider-bidders and the NDL-Wallach group being on relatively equal footing, notwithstanding the conduct of Parker-Blanc); and

(x)    Parker-Blanc's precipitous conduct, though not overlooked and remaining subject to intense scrutiny in the Adversary Proceeding, has not tainted the immediate sale process and thus would not disqualify them as "an entity that

28

purchased [assets of the debtor] . . . in good faith" as those terms are set forth in 11

U.S.C. § 363(m).

*See, e.g., In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997);[19] *In re Russo*, 762 F.2d 239 (2d Cir.

1985); *In re Condere Corp.*, 228 B.R. 615, 632 (Bankr. S.D. Miss. 1998).[20]

## VI.    **Value**.

*Abbotts Dairies* would not seem to require this court to make a determination of "value"

where, as here, good faith per § 363(m) has been found.  However, given that good faith has been

so hotly contested the court feels constrained to reach the value issue.  In the immediate

---

[19]The Second Circuit provided the following analysis (126 F.3d at 392, emphasis in
original):

> Appellants urge us to adopt a *per se* rule that a party's violation of the
> automatic stay renders it incapable of being a good faith purchaser
> under § 363(m).  We decline that invitation for two reasons.  First, we
> have already held that the actions themselves, which are described as
> violations of the stay, did not undermine [the purchaser's] status as
> a good faith purchase within the meaning of § 363(m) because they
> were *not* aimed at influencing the price of the sale.  Moreover, even
> if the actions did violate § 362(a), the automatic stay provision
> includes its own effective policing measures.

[20]Harking back to this court's reference to "bad faith (or non-good faith) purchaser for
value" (and previewing the next point, *infra*, as to value), this court would approve the current
§ 363(b) sale given its factual context and full satisfaction with the fairness and propriety of the
sale process here employed, even if Parker-Blanc were to be denied the status necessary to
garner the § 363(m) benefit on appeal.  This would be the point of dissonance between § 363(b)
and § 363(m), a circumstance which does not seem to abrade *Abbotts Dairies*.  The *transaction*
is bona fide and the *value* is unimpeachable.  (Indeed, the posture on appeal of a sale approval
order based upon a finding – *in error* – of § 363(m) status, on the one hand, and on the other
hand, an appeal from an order approving a § 363(b) sale in a bona fide transaction for value but
denying good faith status, would be most comparable; the erroneously dubbed "good faith
purchaser" would on appeal be stripped of its statutory mootness protection and the appellate
statuses in each instance would then appear to become equivalent.)

circumstances, no one has or reasonably could contest the fact that "value" is being paid by Parker-Blanc.

The assets being sold *do not* include hard assets (many trailers, some tractors, yard equipment, furniture and fixtures), other than some computers.  Accounts receivable and proceeds are being sold (less $300,000 of the $351,000 of cash already in hand with the trustee).  The uncollected receivables are said to have a *face value* of approximately $750,000 (much of which is aged).  Those accounts, along with a litany of business and customer data, the "quitclaiming" of the covenants not to compete, and other intangibles, is what is being acquired in this sale.   The $2.1 million purchase price ($1.1 million at closing and $1.0 million payable in a year or less, secured by a cash escrow), plus the $300,000 in cash and the hard assets left with the trustee (appraised at something in excess of $250,000), is a responsible sale program which the trustee has developed through negotiation.  *He supports it as an exercise of his business judgment.*

The last-minute nonconforming $2 million cash offer from NDL-Wallach, would leave the $351,000 in cash and approximately $750,000 of accounts with the trustee.[21] Even taking the book of aged accounts at face value (an unrealistic overestimation), the Parker-Blanc offer at $2.4 million (compared to the $3.1 million *claimed* as the NDL-Wallach proposal), is greater than seventy-five percent of the nonqualified bid.  That seventy-five percent factor is the oft-used rule of thumb for evaluating and approving sales in bankruptcy, though in practice it is a standard cast

---

[21]Because this last minute offer by NDL-Wallach is sketchy at best, it is not clear what terms are being requested in an Asset Purchase Agreement (none supplied), nor whether hard assets (previously sought by this group) were to be purchased.

against an otherwise pegged asset value.[22]   Surely, the Parker-Blanc bid far outstripped the first

proposal of the competitor, and was in this court's view more favorable than the second

NDL-Wallach offer (with its "back-end" contingency).   And, in this case, where essentially only

accounts and other general intangibles are being sold, the only asset whose value can be

somewhat readily quantified is the book of accounts receivable (against which the purchase price

is more than 250 percent of the *face value* of receipts and aged accounts).   It is emphasized that

the debtor's business has generated *very substantial losses*, and is projected to continue to lose

money into 2010.

In fact, *NDL-Wallach want to buy a court injunction*; that "asset" is not for sale.   And, if

such injunctions against insider-competitors were for sale, Parker-Blanc may well have bid

considerably more – on an apples-to-apples basis – to enjoin NDL-Wallach and bar *them* from the

marketplace.   Parker-Blanc's offer provides real value by any reasonable standard of measure,

and reflects the heated insider contest which persists among the bidding factions.   It is the only

qualified bid, the only bid not premised on the unattainable (an injunction against competition),

and thus both the highest and best bid.[23]

---

[22]The concept of value per *Abbotts Dairies* is expressed as follows: "fair and valuable
consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraisal value
of assets."  788 F.2d at 149, *quoting In re Rock Indus. Mach. Corp.*, 572 F.2d at 1197 n.1.

[23]Courts are often faced with valuation issues which are not neatly supported by
appraisals.  Sometimes it is the sale process itself which supports the evaluation (by reflecting, at
times, the *absence* of other interested purchasers); at other times evaluation is based upon a
trustee's judgment; and, there are occasions when *everyone knows* that a "good deal," and even
an aberrantly good deal, is on the table and should be taken without the need to "look a gift horse
in the mouth."  *See, generally, In re Colony Hill Assoc.*, 111 F.3d 269, 276 (2d Cir. 1997); *In re
Ewell*, 958 F.2d 276, 281-82 (9th Cir. 1992); *In re Tempo Technology Corp.*, 202 B.R. 363, 369
(D. Del. 1996); *In re Temtechno, Inc.*, 1998 WL 887256, *11-*13 (Bankr. D. Del. Dec. 18,

VII.    **Conclusion**.

Insider factions, each competing aggressively for the business of the debtor, have come to judgment day for this sale process.  Each has had full, fair and open access to the trustee for bargaining, and to this court in the development of an equally open and fair bid procedure. Parker-Blanc have won the sale contest.

The "good faith" issue, in the context of this particular case and as pressed by NDL-Wallach[24], is essentially a red herring.  NDL-Wallach could have purchased assets (such as they are) on the same basis as is being done by the enemy, but what they really want to buy is a court-issued injunction to solidify their competitive advantage in the marketplace.  That relief is not on the auction block.


Dated: December 3, 2009                              */s/ Morris Stern*
                                                      MORRIS STERN
                                                      United States Bankruptcy Judge

---

1998).

[24]Others, most notably the Office of the United States Trustee, press a doctrinal position as to the precise tie-in of § 363(m) to § 363(b), and an expressed outrage at the Parker-Blanc postconversion conduct.  As noted throughout this Opinion, the Adversary Proceeding is well-situated to deal with that which has driven the United States Trustee to oppose the position of the appointed Chapter 7 trustee; as to doctrine,  "good faith purchaser" can sometimes be an elusive concept, and transactions can at times have bona fides which render *per se* rules commercially unreasonable.  Case-by-case assessment by those closest to the scene, a pillar of the *Abbotts Dairies* decision, would seem to be the wisest approach.